FERRERI et al., Appellants,

v.

PLAIN DEALER PUBLISHING COMPANY et al., Appellees.

[Cite as *Ferreri v. Plain Dealer Publishing Co.* (2001), 142 Ohio App.3d 629.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77407.

Decided May 14, 2001.

630

632

*Brent L. English,* for appellants.

*Baker & Hostetler, L.L.P., Louis A. Colombo* and *Marcia E. Marsteller,* for appellees.

***

TIMOTHY E. MCMONAGLE, Presiding Judge.

This appeal arises out of media coverage and commentary by *The Plain Dealer* regarding Robert A. Ferreri, a Cuyahoga County Juvenile Court judge.

## A. FACTS AND PROCEDURAL HISTORY

On August 13, 1999, Ferreri and his wife, Diane, filed a defamation complaint against The Plain Dealer Publishing Company, the owner and publisher of *The Plain Dealer* newspaper; *Plain Dealer* reporter James Ewinger; *Plain Dealer* editorial writer Jean DuBail; Brent Larkin, the director of *The Plain Dealer*'s editorial page; David Hall, former editor of *The Plain Dealer*; and *Plain Dealer* cartoonist Jeff Darcy.

In his complaint, appellant[1] alleged that seven publications in *The Plain Dealer* newspaper (four editorials, a political cartoon, and two articles) were defamatory, cast him in a false light, caused him to suffer emotional distress, and caused his wife to suffer a loss of consortium. Copies of the editorials, cartoon, and articles were attached as exhibits to appellant's complaint and are reproduced as an Appendix to this opinion.

The first of the editorials—"Judging the judge"—was published on the editorial page of *The Plain Dealer* on August 18, 1998. In that editorial, *The Plain Dealer* commented on disciplinary proceedings involving appellant, opined that Ferreri's actions were an affront to the honor of the justice system, and concluded that "[t]he proper punishment, then, is to remove Ferreri from the bench, permanently." In his complaint, appellant alleged that the editorial falsely accused him of being "a reckless, arrogant, publicity-hungry bully" and defamed him by stating:

"He has not and never will have the self-control, the evenness of temperament, the strict sense of fairness, the willingness to listen, the innate sense of dignity— indeed, any of the qualities that make a mere lawyer into a good jurist.

"* * *

"The judge has forgotten beyond hope of recall that the honor paid when he enters or leaves the courtroom is not just for him, but for the law, too. It is an honor he is no longer due."

The second editorial, entitled "A close call at Juvenile Court," was published in *The Plain Dealer* on November 22, 1998. In this editorial, *The Plain Dealer* commented on the selection of the new administrative judge of the Juvenile Court, and applauded the selection of Judge John Gallagher over two other judges, one of whom was appellant. Appellant's complaint alleged that the characterization in the editorial of his conduct of "late" as "scandalous" was false and defamatory.

The third editorial at issue was published on December 14, 1998. In that editorial, entitled "Bickering jurists," *The Plain Dealer* opined that it was good that appellant had not been selected as administrative judge for the juvenile court. The editorial stated, "Ferreri, however, still hopes to claim the prize, insisting that Gallagher's selection was illegal and the job should be his by right of seniority." It continued, "Ferreri appears to be beyond the call of reason at this point, so we will waste no effort appealing to his better nature" to stop maneuvering to obtain the position of administrative judge. In his complaint,

---

1. Appellants will hereinafter be referred to in the singular because Diane Ferreri's claim is derivative of her husband's claims.

appellant alleged that the accusation that he was "beyond the call of reason" was false and defamatory.

The final editorial at issue, entitled "Poor judges of judicial conduct," was published on December 20, 1998. The editorial was sharply critical of what it perceived as a lenient sentence for appellant from the disciplinary board. The editorial stated:

"[I]n reviewing the evidence against Ferreri, the board allowed itself to be swayed by the judge's claims that he always had the best interest of children at heart. We, too, believe that Ferreri cares about children, but the evidence is clear that he cares a good deal more about himself and his image, and that his good intentions are regularly overwhelmed by his foul temper and massive ego."

Appellant's complaint alleged that the statement that "he cares more about himself and his image, and that his good intentions are regularly overwhelmed by his foul temper and massive ego" was false and defamatory.

On June 11, 1999, *The Plain Dealer* published a political cartoon on the editorial page. The cartoon depicted appellant sitting behind bars in "Juvenile Detention" with a child in an adjacent cell saying, "Yeah...I know, we're all innocent in here, pal! Got any bubble gum?" In his complaint, appellant alleged that the cartoon placed him in a false light because it "conveyed the false and defamatory idea that [he] had been sent to jail for alleged misconduct when, in fact, he was only suspended by the Supreme Court of Ohio from acting as a judge and from practicing law ."

The first of the two allegedly defamatory articles was published in the Metro section of *The Plain Dealer* on August 13, 1998. The article, captioned "Hearing begins on outspoken judge," reported on appellant's disciplinary proceeding before a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court. The article reported generally about the nature of the hearing and the various witnesses at the hearing. The article contrasted appellant's "restrained" demeanor at the hearing with his less-restrained conduct in a prior proceeding before the administrative judge of the Cuyahoga County Court of Common Pleas in which, the article reported, appellant was "generally combative, telling a court official to shut up and asking another judge if he knew how to read." Appellant's complaint alleged that the statement in the article that appellant appeared before the administrative judge to "argue about why he should hold onto several high-profile cases that belonged on another judge's docket" was false and defamatory.

The second allegedly defamatory article regarding appellant was published in *The Plain Dealer* on November 4, 1998. This article, entitled "8 incumbents keep Common Pleas seats" reported on the judges in the Cuyahoga County Court

of Common Pleas who were re-elected in November 1998. After reporting the election results for the juvenile division judges, the article stated:

"The election was considered crucial because the county's six Juvenile Court judges have been locked into a pattern of internal strife and bickering that many believe interferes with the administration of justice.

"Those remaining and the new judges will have to deal with controversial Judge Robert A. Ferreri, who is widely viewed as the center of many of the disputes. Ferreri was not up for re-election this year.

"A branch of the Ohio Supreme Court has recommended that he be suspended as a judge because of numerous false statements he is accused of making about other judges and court officials.

"In spite of his problems, many expect Ferreri to ask his fellow judges to install him as the court's next administrative judge. That would give him control of that division and all of the patronage there.

"The election gives the Democrats four judgeships, while Ferreri and Gallagher are the only Republicans."

Appellant's complaint alleged that the "accusation" that he was at the "center of many" disputes which had locked the Juvenile Court of Cuyahoga County "into a pattern of internal strife and bickering that many believe interferes with the administration of justice" was false and defamatory.

On November 1, 1999, appellees moved to dismiss appellant's claims pursuant to Civ.R. 12(B)(6), or, in the alternative, to strike certain paragraphs of the complaint. Appellant failed to respond to appellees' motion within the time permitted by Civ.R. 6(E) and Cuyahoga County Common Pleas Local R. 11(C) (*i.e.*, ten days later, or by November 11, 1999). On November 17, 1999, the parties entered into a stipulation providing that appellant could have until December 17, 1999 to respond to appellees' motion to dismiss. The stipulation was filed the same day.

On November 18, 1999, the trial court granted appellees' motion and dismissed appellant's claims "in [their] entirety, for failure to state a claim upon which relief may be granted."

Eight days later, on November 26, 1999, appellant sought relief from judgment from the trial court. Appellees opposed appellant's motion. On December 17, 1999, the trial court granted appellant's motion to file a reply brief *instanter*. Before the trial court ruled on appellant's motion for relief from judgment, however, appellant filed his notice of appeal, asserting two assignments of error for our review.

## B. FIRST ASSIGNMENT OF ERROR

Appellant's first assignment of error states:

"I. The trial court failed to give plaintiffs sufficient time to respond to defendants' prolix motion to dismiss and thereby deprived them of due process of law."

In his first assignment of error, appellant contends that the trial court failed to give him sufficient time to respond to appellees' motion to dismiss and thereby deprived him of due process of law. Appellant contends that he filed a stipulation on November 17, 1999, giving him until December 17, 1999, in which to respond to appellees' motion. Accordingly, appellant asserts, by granting appellees' motion on November 18, 1999, without the benefit of his arguments in opposition and notwithstanding the stipulation, the trial court denied him due process of law. Appellant's argument is unpersuasive.

Appellees filed their motion to dismiss on November 1, 1999, and served it by mail. Pursuant to Loc.R. 11(C) of the Court of Common Pleas of Cuyahoga County, a party opposing a motion shall serve and file its brief in opposition within seven days after service of the motion. Civ.R. 6(E) further provides that a party receives three additional days to file its brief in opposition when a motion is served by mail. Accordingly, absent an enlargement of time, appellant's response to appellees' motion was due by November 11, 1999.

Appellant failed to respond to appellees' motion, however, by November 11, 1999. Instead, on November 17, 1999, appellant obtained a stipulation from appellees in which appellees agreed that appellant could have until December 17, 1999, in which to respond to appellees' motion. Appellant filed the stipulation with the court on the same day. On November 18, 1999, however, before receiving appellant's brief in opposition, the trial court granted appellees' motion to dismiss.

Civ.R. 6(B) provides the procedure for obtaining an extension after expiration of a deadline. It provides:

"When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion * * * *upon motion made after the expiration of the specific period* permit the act to be done where the failure to act was the result of excusable neglect * * *." (Emphasis added.)

█ Accordingly, when appellant missed his response date of November 11, 1999, he was required by Civ.R. 6(B) to file a motion with the court, requesting leave to file his response after the deadline. Instead, appellant attempted to avoid the requirements of Civ.R. 6(B) by obtaining a stipulation from appellees

for extra time. Once the deadline had passed, however, appellees had no authority to extend the deadline and, accordingly, appellees' agreement after expiration of the deadline to any extra time was irrelevant. Once the deadline had passed, only the trial court could extend it. See *Ronald Markowitz Real Estate, Inc. v. Sherwin–Williams Co.* (Aug. 5, 1993), Cuyahoga App. No. 63379, unreported, 1993 WL 302381.

Moreover, even if appellant had filed the required motion pursuant to Civ.R. 6(B) motion, it is unlikely the trial court would have granted it. As the Tenth District Court of Appeals explained in *Barnett v. Carquest Auto Parts of Whitehall* (Dec. 8, 1998), Franklin App. No. 98AP–372, unreported, 1998 WL 869673:

"Civ.R. 6(B) permits the trial court to extend the time for filing a responsive motion after the prescribed time for filing has expired, upon a showing that the failure to timely file was the result of excusable neglect. However, it does not mandate that the court grant the extension of time to file, especially where the appellant has given no indication that the failure to timely file was the result of excusable neglect."

Here, appellant argued in his motion for relief from judgment that because he had obtained a stipulation from appellees for extra time, his failure to timely file a response constituted "excusable neglect." This court has previously found, however, that obtaining a stipulation from the opposing party in lieu of filing the proper motion for additional time does not constitute excusable neglect. *Ronald Markowitz, supra.*

█ Furthermore, as discussed in detail below, appellant's claims fail to state a claim upon which relief can be granted and thus are insufficient as a matter of law. Therefore, even if the trial court had considered appellant's brief in opposition, it would have reached the same result, *i.e.,* dismissal of appellant's claims. Thus, we find no denial of due process under these circumstances.

Appellant's first assignment of error is overruled.

## C. SECOND ASSIGNMENT OF ERROR

Appellant's second assignment of error states:

"II. The trial court improperly dismissed plaintiff's complaint."

In his second assignment of error, appellant asserts that the trial court improperly granted appellees' motion to dismiss.

## 1. STANDARD OF REVIEW

 When an appellate court reviews a judgment granting a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim, it must independently review the complaint to determine whether the dismissal was appropriate. *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, overruled in part on other grounds, *Tulloh v. Goodyear Atomic Corp.* (1992), 62 Ohio St.3d 541, 584 N.E.2d 729; *Guess v. Wilkinson* (1997), 123 Ohio App.3d 430, 433, 704 N.E.2d 328, 329–330. The factual allegations of the complaint and items properly incorporated therein must be accepted as true. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 281, 649 N.E.2d 182, 184–185, citing *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753, 755–756. Furthermore, the plaintiff must be afforded all reasonable inferences possibly derived therefrom. *Id.* In order for a judge to grant a motion to dismiss for failure to state a claim, it must appear " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 60, 565 N.E.2d 584, 589, citing *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 245, 71 O.O.2d 223, 224–225, 327 N.E.2d 753, 754.

## 2. THE EDITORIALS

 Under Ohio law, expressions of opinion are generally protected under Section 11, Article I of the Ohio Constitution as a valid exercise of freedom of the press. *Vail, supra,* at 281, 649 N.E.2d at 184–185; *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 244–245, 25 OBR 302, 302–304, 496 N.E.2d 699, 701–702.

 Whether a statement constitutes fact or opinion is a question of law to be determined by the court. *Vail, supra.* In determining whether an allegedly defamatory statement is fact or opinion, a court must consider the totality of the circumstances. *Id.* at the syllabus; *Scott, supra,* at 250, 25 OBR at 307–308, 496 N.E.2d at 705–706. "Specifically, the court should consider: the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Vail, supra.* The standard is "fluid," however. *Id.* "Every case will present facts that must be analyzed in the context of the general test. Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." *Id.*

 Based on our independent review of the totality of the circumstances, we conclude that the alleged false and defamatory statements in the editorials were expressions of opinion subject to constitutional protection.

First, the language used in the editorials makes it clear that an ordinary reader would interpret the statements to be expressions of the newspaper's opinion, rather than factual reports. For example, the November 22, 1998 editorial opens with a sarcastic remark about "[a]n outburst of sanity" in the Cuyahoga County Juvenile Court. The August 18, 1998 editorial uses equally vivid rhetoric by characterizing appellant as a "reckless, arrogant, publicity-hungry bully." Use of such sarcasm, editorial hyperbole, and epithets has long been recognized as constitutionally protected speech, regardless of whether the statements are classified as "opinion" or "rhetorical hyperbole." See *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1; *Vail, supra,* at 282–283, 649 N.E.2d at 185–186; *Stepien v. Franklin* (1988), 39 Ohio App.3d 47, 51, 528 N.E.2d 1324, 1329–1330; *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423–424, 453 N.E.2d 666, 669–670; *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 137, 21 OBR 143, 146–147, 486 N.E.2d 1220.

This court has previously acknowledged that " 'the language of the entire column may signal that a specific statement which, sitting alone, would appear to be factual is in actuality a statement of opinion.' " *DeVito v. Gollinger* (1999), 133 Ohio App.3d 51, 55, 726 N.E.2d 1048, 1051, quoting *Logan v. Fairfield* (Oct. 26, 1989), Cuyahoga App. Nos. 56052 and 56055, unreported, 1989 WL 129119. Here, the editorials characterize their statements as "reflections," "argument," "thinking," "hopes," "belief," and "our view." Such characterizations make it clear that an ordinary reader would interpret the statements to be opinion, rather than fact.

The second factor in the "totality of circumstances" test is whether the statements are objectively verifiable. "[W]here the '* * * statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.' " *Scott, supra,* at 251–252, 25 OBR at 309, 496 N.E.2d at 707. In other words, a statement lacking a plausible method of verification is an opinion.

Here, taken as a whole, the statements made in the editorials are expressions of opinion because they cannot be objectively proved or disproved. There are no objective tests to establish whether someone's conduct is "scandalous," whether an individual is "beyond the call of reason," has the "qualities that make a mere lawyer into a good jurist," or "cares a good deal more about himself and his image" than children. Any such determinations would necessarily be based only on an individual's opinion, not objectively verifiable facts.

The third and fourth factors of the "totality of circumstances" test require an examination of the general and broad contexts of the statements. Here, all of the editorials at issue were published on the editorial page of *The Plain Dealer,* where people know that they are reading opinions and not news stories. Furthermore, the editorials were published shortly after the conclusion of disciplin-

ary proceedings against appellant. Any official disciplinary proceeding against a judge is a matter of keen public interest and concern. The editorials at issue criticized the disciplinary proceedings and the appropriateness of appellant's punishment. They questioned whether the disciplinary system lived up to its ideal of upholding the standards and integrity of the judiciary or whether appellant got off too easy. In this context, it should be apparent to an ordinary reader that the newspaper was stating its opinion regarding appellant and his fitness to remain in office.

Thus, based on our independent review of the "totality of the circumstances" test, we conclude that the alleged defamatory statements in the editorials constituted opinions and, therefore, are not actionable as a matter of law. Accordingly, the trial court properly dismissed appellant's defamation claims regarding the editorials.

### 3. THE CARTOON

The political cartoon similarly constitutes an editorial opinion and not an assertion of fact.

In order to be defamatory, a publication must contain an assertion of fact. *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 346, 535 N.E.2d 755, 758–759. There is no such assertion in the cartoon at issue here. Contrary to appellant's assertion, no reasonable person could conclude from viewing the cartoon that appellant had actually been jailed in "Juvenile Detention" and was falsely proclaiming his innocence to a child in an adjacent cell. The scene depicted was exaggeration and hyperbole, not reasonably capable of being interpreted as factual or defamatory. *Id.* Thus, as an expression of opinion rather than a statement of fact, it is not actionable as a matter of law and the trial court properly dismissed appellant's defamation claim regarding the cartoon.

### 4. THE ARTICLES

Defamation is "a false and malicious publication against an individual made with an intent to injure his reputation or to expose him to public hatred, contempt, ridicule, shame, or disgrace or to affect him injuriously in his trade, business or profession." *Robb v. Lincoln Publishing (Ohio), Inc.* (1996), 114 Ohio App.3d 595, 616, 683 N.E.2d 823, 837.

Whether or not a statement is defamatory is an issue of law for the court. *Yeager, supra; Mendise v. Plain Dealer Publishing Co.* (1990), 69 Ohio App.3d 721, 726, 591 N.E.2d 789, 792. When considering whether a statement is defamatory, the trial court is directed to review the statement under the totality of the circumstances. *Scott, supra,* at 253, 25 OBR at 310–311, 496 N.E.2d at

708. Words should be given their plain and ordinary meaning when evaluating them and should be read in context of the whole in which they were reported, rather than in isolation. *Celebrezze v. Netzley* (Aug. 4, 1988), Cuyahoga App. Nos. 53864 and 53865, unreported, 1988 WL 87566.

■ In addition, in evaluating whether words are defamatory, the court is to apply the "innocent construction rule," which provides that if allegedly defamatory words are susceptible of two meanings, one defamatory and one innocent, the defamatory meaning should be rejected and the innocent meaning adopted. *Yeager, supra,* at 372, 6 OBR at 423–424, 453 N.E.2d at 669–670.

The allegedly defamatory remark in the August 13, 1998 article consists of the statement that appellant appeared before the administrative judge of the Court of Common Pleas of Cuyahoga County and "argued about why he should hold onto several high-profile cases that belonged on another judge's docket." Appellant contends that this falsely implied that he had acted improperly when, in fact, he did not.

With respect to the November 4, 1998 article, appellant objects to the statement that he was at the "center" of disputes in the juvenile court that had locked the court into a pattern of "internal strife and bickering that * * * interferes with the administration of justice."

■ We find these statements not defamatory as a matter of law. The statement that appellant appeared before the Cuyahoga County Common Pleas Court administrative judge and argued about why he should hold onto several high-profile cases that belonged on another judge's docket does not make any slanderous assertion of unethical, criminal, or immoral conduct by appellant. It merely states what appellant did, without making any corresponding judgment regarding appellant's actions. Thus, the statement is "not so definite as to be defamatory." *Gruenspan v. Seitz* (1997), 124 Ohio App.3d 197, 210, 705 N.E.2d 1255, 1263.

■ The statements at issue in the second article are also not defamatory. Our review of the article, as a whole, indicates that the statements simply convey information regarding the functioning of the juvenile court. Moreover, a statement that appellant is at the "center" of the disputes is not defamatory in itself. Rather, it is the reader's perception of appellant's conduct as good or bad, not the statement itself, that could potentially affect appellant's reputation. The statement itself makes no defamatory assertion regarding appellant's conduct.

■ Furthermore, the allegedly defamatory statements in the articles are nondefamatory under the "incremental harm" doctrine. " 'This doctrine measures the incremental reputational harm inflicted by the challenged statements

beyond the harm imposed by the nonactionable remainder of the publication; if that incremental harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable.'" *Brite Metal Treating, Inc. v. Schuler* (May 13, 1993), Cuyahoga App. No. 62360, unreported, 1993 WL 158256, quoting *Masson v. New Yorker Magazine, Inc.* (C.A.9, 1989), 881 F.2d 1452, 1457–1458.

■ The August 13, 1998 article reported that appellant was accused of publicly making false statements about judges and other court officials; had been accused of judicial misconduct and a violation of the Code of Professional Responsibility; had asserted on tape that the wife of a lawyer in an adoption case he was handling worked as a law clerk for an appellate court judge and had written an opinion favorable to her husband, when appellant knew the accusation to be false; and that when appellant had previously appeared before the administrative judge of Cuyahoga County Common Pleas Court in May, he had been "generally combative, telling a court official to shut-up and asking another judge if he knew how to read." Against this backdrop, the statement at issue— that appellant appeared before the administrative judge to "argue about why he should hold on to several high-profile cases that belonged on another judge's docket"—could not harm appellant's reputation in any way beyond the harm already caused by the other non-actionable statements in the article.

■ Similarly, the statement that appellant complains of in the second article—that he was "widely viewed as the center of many of the disputes" in juvenile court that had "locked [the court] into a pattern of internal strife and bickering that many believe interferes with the administration of justice"—could not harm appellant's reputation more than the harm already caused by the other statements in the article that appellant had been recommended for suspension as a judge because he had made numerous false statements about other judges and court officials. Accordingly, the statements are not actionable as a matter of law, and, therefore, the trial court properly dismissed appellant's defamation claims based on the articles.

## 5. REMAINING CLAIMS

Appellant's complaint also asserted a claim for invasion of privacy under a "false light" theory of recovery. The Ohio Supreme Court has never recognized a cause of action for false light invasion of privacy, however. The court has again recently declined to recognize this tort. *M.J. DiCorpo, Inc. v. Sweeney* (1994), 69 Ohio St.3d 497, 507, 634 N.E.2d 203, 210, citing *Yeager, supra.* Absent an authoritative pronouncement from the Ohio Supreme Court, we likewise decline to recognize this tort, and, accordingly, affirm the judgment of the trial court dismissing this claim.

Likewise, we affirm the trial court's judgment dismissing appellant's emotional distress claim. As set forth above, appellant has failed to state a claim for defamation on any of the allegedly defamatory statements. As a result, his emotional distress claim, which is predicated upon the allegedly defamatory statements, is also insufficient and fails to state a claim upon which relief can be granted. Mrs. Ferreri's loss-of-consortium claim is similarly derivative of appellant's defamation claims and, therefore, also fails.

Appellant's second assignment of error is therefore overruled.

*Judgment affirmed.*

KILBANE, J., concurs.

DYKE, J., concurs in judgment only.

APPENDIX

# Metro

THE PLAIN DEALER

Judge Robert A. Ferreri watches a videotape of a interview he gave to a local television station.

DALE OMORI/PLAIN DEALER PHOTOGRAPHER

# Hearing begins on outspoken judge
## Ferreri is accused of several disciplinary infractions

By JAMES EWINGER
Plain Dealer Reporter

Lawyers for a Cuyahoga County Juvenile Court judge on trial for disciplinary infractions characterized him as a passionate advocate for children who fights for his beliefs.

Lawyers for the Ohio Supreme Court also are acting to present a painted a picture of the judge as a reckless, mean-spirited liar who uses the news media to blast enemies and someone who lapses into noisy advocacy when quiet detachment would be appropriate.

Judge Robert A. Ferreri's hearing began yesterday with opening statements and four witnesses called by Disciplinary Counsel Jonathan Coughlan and Assistant Disciplinary Counsel Lori Brown.

Ferreri is accused of publicly making numerous false statements about judges and other court officials who have earned his wrath. Brown said Ferreri's acts, committed largely in 1995 and 1996, amounted to judicial misconduct and a violation of the code of professional responsibility that governs all Ohio lawyers.

Gerald S. Gold, Ferreri's lead lawyer, said Ferreri began his career as a prosecutor in 1981 and was elected judge in 1988 — all after outstanding work as a student in high school and college.

"He is an intense individual who will not back away if he thinks he's right," Gold said.

Ferreri never intentionally misstated anything, Gold said. He made some remarks to a TV reporter about a recent highly publicized transracial adoption case after being assured he was not being recorded.

The tape only was made public because a lawyer in the underlying case got copies and sent them to the Supreme Court and media. Gold said. In the adoption case Gold said Ferreri "did sound like an advocate. He believed in what he did."

He referred to a case with racial overtones that began in 1994 when a white Eastlake couple and a black Cleveland Heights couple fought over the adoption of two young black children.

Ferreri supported the Heights family and gave them custody. But three 8th District Ohio Court of Appeals judges in 1996 said Ferreri had no jurisdiction and handed the case to Cuyahoga County Probate Judge John J. Donnelly. Donnelly let the Eastlake couple adopt the children earlier this year.

Ferreri was interviewed about the Appeals Court reversal when it came down. According to a transcript and tape played yesterday, he said the wife of a lawyer in the adoption case worked as the law clerk for one of the Appeals Court judges, and she wrote an opinion favorable to her husband.

The judge also is being tried for numerous statements about another judge and Juvenile Court officials that were printed in two weekly papers. He characterized them as part of a conspiracy to cover up abuses at the county's juvenile detention center.

Ferreri was called to testify as Coughlan's first witness and was on the stand about two hours. He said he knew the law clerk did not write the opinion and that he was only making a joke with a poor choice of words

SEE COURT/2-B

EXHIBIT

A

**646**

DALE OMORI · PLAIN DEALER PHOTOGRAPHER

Judge Robert A. Ferreri answers questions yesterday in his disciplinary hearing.

# Hearing begins on outspoken juvenile judge

### COURT FROM 1-B

The judge's demeanor yesterday was more restrained than when he appeared before Presiding Common Pleas Judge Richard J. McMonagle in May, to argue about why he should hold onto several high-profile cases that belonged on another judge's docket.

In that case, currently under review by the Ohio Supreme Court, Ferreri was generally combative, telling a court official to shut up and asking another judge if he knew how to read.

He was more genial yesterday,

but at times tried to take control of his own cross-examination. He gave Coughlan a mock salute when the lawyer told him to proceed with his answer during questioning. Ferreri also said there were problems at the detention center "and since I say something about it, you're going after me? I find that shocking."

Testimony may conclude today

The hearing is being conducted by a three-person panel from the Supreme Court's 28-member Board of Commissioners on Grievances and Discipline

Panelists are Toledo lawyer Raymond G. Esch, Summit

County Common Pleas Judge James R. Williams, and Sandusky resident Peggy A. Murray, a non-lawyer. Esch chairs the panel. Williams is the former U.S. Attorney for the Northern District of Ohio and is the Ohio judge who sentenced Jeffrey Dahmer to life in prison in 1992, for a murder he committed before his lethal rampage in Milwaukee.

The panel can dismiss the charges on the spot, or can make a recommendation to the full board, which would make its own recommendation to the Supreme Court's seven justices

The result can range from no action or a simple reprimand to disbarment

EXHIBIT

B

8-B

# THE PLAIN DEALER

TUESDAY, AUGUST 18, 1998

ALEX MACHASKEE
President and Publisher

DAVID HALL
Editor

ROBERT M. LONG
Executive Vice President

BRENT W. LARKIN
Editorial Page Director

THOMAS H. GREER
Vice President, Senior Editor

# Judging
# the judge

## A suspension would be undeserved leniency for Juvenile Court's wayward Ferreri

Why do we stand when judges enter or leave a courtroom? Mainly because we honor, through them, the dignity and the majesty of the law. But we honor the judges as well, because we believe they wouldn't have been granted their considerable powers without showing they could be trusted to use them responsibly.

Such, at any rate, is the ideal. The actual, unfortunately, sometimes falls short of that standard. And when it does, far more is damaged than the interests of the parties in any one case. The majesty of the law suffers, too, and with it our confidence that the justice system is truly just.

These reflections are prompted by the career of Juvenile Court Judge Robert A. Ferreri, who was on trial himself last week before a special panel of the Ohio Supreme Court's Board of Commissioners on Grievances and Discipline. The court's disciplinary counsel, acting as prosecutor, presented evidence that Ferreri had disgraced himself and the bench in a number of ways, mainly by lying to reporters about other judges and court officials.

The disciplinary counsel recommended that Ferreri be suspended for 18 months, but it will be some time before the special panel, the full Board of Commissioners and the Supreme Court consider the matter return.

A suspension might be sufficient if the charges aired last week were the only ones Ferreri faces, but there are many others, including some that are the subject of separate disciplinary proceedings. Taken together, they provide ample argument that Ferreri, far from embodying the dignity of the law, has made a mockery of it. He is — we say it again — a reckless, arrogant, publicity-hungry bully. He has not and never will have the self-control, the evenness of temperament, the strict sense of fairness, the willingness to listen, the innate sense of dignity — indeed, any of the qualities that make a mere lawyer into a good jurist.

Ferreri's own lawyer argues that the mere act of putting the judge on trial is punishment enough, but that argument puts more value on Ferreri's image than on that of the justice system. For that system not to punish Ferreri severely would be to admit that his conduct is somehow acceptable, when it ought to be considered reprehensible.

The proper punishment, then, is to remove Ferreri from the bench, permanently. If that seems harsh, so be it. The judge has forgotten beyond hope of recall that the honor paid when he enters or leaves the courtroom is not just for him, but for the law, too. It is an honor he is no longer due.

648

# The Plain Dealer Summary

## INTERNATIONAL

**5 ARRESTED IN N. IRELAND**
British police arrested five men yesterday for questioning in towns near Omagh, Northern Ireland, where a car bomb attack on Saturday killed 28 people and injured 220. The blast, the deadliest in 29 years of sectarian violence is widely believed to have been the work of a group that calls itself the Real IRA, a splinter group whose members left the Irish Republican Army this year.**1-A**

**BALLOONIST'S DREAM ENDS**
Chicago millionaire Steve Fossett's dream of flying his balloon nonstop around the world ended when a fierce thunderstorm knocked him out of the sky, hurling him 29,000 feet into the Coral Sea. He was rescued late yesterday by a yacht that plucked him out of a life raft 500 miles off Australia's east coast. He had traveled 15,200 miles, completing two-thirds of his planned journey.**3-A**

**SUSPECT DENIES BOMBINGS**
After three days of questioning, a suspect in the twin U.S. Embassy bombings in East Africa has not admitted any role in the crimes or implicated anyone else, the FBI said yesterday.**3-A**

offer by the federal government to receive a similar chopper for free.**1-B**

## EDITORIALS/FORUM

**NOT ENOUGH**
The 18-month suspension recommended for Cuyahoga County Juvenile Court Judge Robert Ferreri is too lenient. He should be removed from the bench for his many instances of misbehavior. An editorial.**8-B**

**GET IT OVER WITH**
If President Clinton must eat crow, then he ought to clean his plate and get all of us on to the next course, columnist Phillip Morris writes.**9-B**

**EXTINCTION AHEAD**
The megamergers in the telecommunications industry won't save the dinosaurs; they'll just make bigger, doomed dinosaurs, industry expert David C. McCourt writes.**9-B**

at 78. He laced humor with heart-filled words, comment Bud Shaw.**1-D**

## EVERYWOMAN

**HAIL TO THE QUEEN**
As long as she can remember Stephanie Smith of Centerburg has dreamed of winning the Ohio Pork Industry Queen title she has been showing hogs at state and county fairs for more than half of her 18 years.**1-F**

**STRONG FOUNDATION**
WITAN is an Akron-based women's foundation that has funded projects ranging from feeding a horse on a therapeutic riding farm to transforming an illegal dump into a community garden. "Our focus is to make the community a better place to live," says WITAN's president "That gets pretty broad."**1-F**

# 8 incumbents keep Common Pleas seats

By JAMES EWINGER
PLAIN DEALER REPORTER

Eight incumbent Cuyahoga County Common Pleas judges secured new terms while two newcomers upset veteran jurists.

Westlake attorney Bridget McCafferty was fired earlier this year as a Juvenile Court magistrate, but Cuyahoga County voters essentially hired her last night as a judge in the Common Pleas Court's General Trial Division. She defeated Judge Kathleen Craig, a former assistant county prosecutor appointed to a vacancy by Gov. George V. Voinovich.

McCafferty campaigned vigorously and worked hard to sidestep questions about a lack of experience and court records showing that she was fired as a magistrate after mere months on the job because court officials said she could not handle the job.

Craig, formerly in charge of the prosecutor's grand jury unit, ran on her years of experience as a lawyer.

None of the governor's judicial appointments got retained by the voters.

Richard Lillie, appointed to an unexpired term, was defeated by experienced attorney Ann Mannen.

Judge Peggy Foley Jones defeated attorney Michael Russo, who led in some of the early returns.

Incumbents coasting to easy victories were Frank D. Celebrezze Jr., Jose Villanueva, and Timothy J. McGinty.

In Domestic Relations Court, Judge Cheryl S. Karner won another term, easily overcoming attorney Raymond R. Froelich, Kathleen O'Malley, a magistrate in the court, defeated Juvenile Court Judge John W. Gallagher, who was seeking an open seat on the domestic bench.

Gallagher has two years left on his term in Juvenile Court. He had served in Domestic Relations Court before being defeated by Judge Anthony Russo in 1992.

Despite Gallagher staying on in the Juvenile Court division, that unit of the Common Pleas Court experienced the most sweeping changes at the polls yesterday.

Assistant County Prosecutor Joseph Russo won the remainder of an unexpired term, left when Judge Kenneth Rocco was elected to the 8th District Ohio Court of Appeals in 1996. The vacancy had been filled since then by William Chinnock, who chose not to go on the ballot.

Janet Burney beat Margaret Rose Foley for a full term on the bench vacated by Judge Betty Willis Ruben, who did not seek re-election.

Judge Patrick Corrigan was re-elected by a wide margin, while Judge Peter Sikora beat back a challenge from attorney Colleen O'Toole.

The election was considered crucial because the county's six Juvenile Court judges have been locked into a pattern of internal strife and bickering that many believe interferes with the administration of justice.

Those remaining, and the new judges will have to deal with controversial Judge Robert A. Ferreri, who is widely viewed as the center of many of the disputes. Ferreri was not up for re-election this year.

A branch of the Ohio Supreme Court has recommended that he be suspended as a judge because of numerous false statements he is accused of making about other judges and court officials.

In spite of his problems, many expect Ferreri to ask his fellow judges to install him as the court's next administrative judge. That would give him control of that division and all of the patronage there.

The election gives the Democrats four judgeships, while Ferreri and Gallagher are the only Republicans.

EXHIBIT

C

650

# A close call at Juvenile Court

An outburst of sanity appears to have saved the Cuyahoga County Juvenile Court from a renewal of the crassly political and self-serving administration that has so often plagued it in the past.

**AGENDA '98**

**YOUTH AT RISK**

Judge John Gallagher was selected last week as chief judge of the six-member Juvenile bench, despite weeks of furious behind-the-scenes maneuvering for the job by Judge Peter M. Sikora, one of the court's two most disruptive influences.

In the end, Gallagher, the first Republican ever to hold that post, owed his selection to the support of two Democrats: outgoing Administrative Judge Betty Willis Ruben and recently re-elected Judge Patrick F. Corrigan.

Sikora, the court's senior Democrat, in no way deserved the honor he sought and, owing to the rules of seniority, could not have won it even if his party colleagues had supported him. The most likely result of his unsuccessful scheming would have been to put Republican Judge Robert M. Ferreri in charge. That would have been even worse for the court, because Ferreri's conduct of late has been so scandalous that he is the subject of disciplinary action by the state and might well lead to his removal from office.

It is shameful, of course, that partisan considerations figure so prominently in questions of court administration. The sole consideration ought to be the public interest, which in this case requires the continuation of reforms championed by Ruben. Since Gallagher is far more likely to pursue such a course than either Sikora or Ferreri, he was the only suitable choice for administrative judge.

Ruben, whose retirement is near, is to be commended for recognizing and acting on that fact. True, she could afford to ignore party labels, but she deserves credit nonetheless.

Corrigan deserves credit, too. He was under tremendous pressure to toe the party line, and very nearly succumbed to it. His party may not like what he did, but the public has cause to thank him.

EXHIBIT

D

EXHIBIT

E

8-B

# THE PLAIN DEALER

### MONDAY, DECEMBER 14, 1998

ALEX MACHASKEE
President and Publisher

DAVID HALL
Editor

ROBERT M. LONG
Executive Vice President

BRENT W. LARKIN
Editorial Page Director

THOMAS H. GREER
Vice President, Senior Editor

# Bickering jurists

## Juvenile Court judges put children's interests behind their own in fight for top position

Once again, we've made the mistake of thinking things couldn't possibly get worse in Cuyahoga County Juvenile Court.

We're not thinking about what goes on in the courtrooms, where there's at least a semblance of order, if not of efficiency. We're thinking about what goes on in and between the judges' chambers, which are the scenes of truly Byzantine political intrigue.

**AGENDA '98**

**PUBLIC TRUST**

At stake in this intrigue is nothing that can be dignified with the name of "issue," nothing that has to do with the welfare of abused, neglected or delinquent children. It's all about power, about who gets to run the little bureaucratic kingdom on E. 22nd St. It's all about who gets to be administrative judge.

Like all Ohio courts with more than one judge, the Cuyahoga juvenile bench each year selects one of its number to serve as chief. This person assumes responsibility for the day-to-day management of the courthouse, its employees and its operations outside of the courtrooms themselves. In recent years, the selection has been hotly contested, reflecting not only the court's even division between Republicans and Democrats, but also the personal feuds waged by one judge against another.

In the most recent election, Chief Judge Betty Willis Ruben, a Democrat retiring at the end of this month, helped arrange the selection of Judge John Gallagher, a Republican — the first ever to serve as administrative judge of the juvenile bench. She did so to prevent the selection of either Judge Peter Sikora, a Democrat, or of Robert Ferreri, a Republican. Rightly so, because Sikora cannot be counted on to continue the badly needed reforms that Ruben instituted, and Ferreri is the subject of disciplinary proceedings that could — and should — result in his removal from the bench.

Ferreri, however, still hopes to claim the prize, insisting that Gallagher's selection was illegal and the job should be his by right of seniority. Sikora, too, continues to maneuver, hoping that Ferreri's mischief-making will give the Democrats the excuse they need to call a new election in January, when they will have a majority on the court.

Ferreri appears to be beyond the call of reason at this point, so we will waste no effort appealing to his better nature. But we still have hopes that Sikora can be persuaded to put the interests of the institution and the children it serves above his own and those of his party.

652

2-D

# THE PLAIN DEALER

### SUNDAY, DECEMBER 20, 1998

ALEX MACHASKEE
President and Publisher

DAVID HALL
Editor

ROBERT M. LONG
Executive Vice President

BRENT W. LARKIN
Editorial Page Director

THOMAS H. GREER
Vice President, Senior Editor

# Poor judges of judicial conduct

A disciplinary board's recommendation that Cuyahoga County Juvenile Court Judge Robert A. Ferreri be placed on probation rather than suspended for his egregious misconduct shows why it is not always a good idea to let lawyers and judges pass judgment on each other.

**AGENDA '98**

**PUBLIC TRUST**

It is, or ought to be, the prime responsibility of the 28 board members (24 of whom are lawyers) to uphold the standards of judicial conduct, and those standards are, or ought to be, rigorous ones. But in reviewing the evidence against Ferreri, the board allowed itself to be swayed by the judge's claims that he always had the best interest of children at heart. We, too, believe, that Ferreri cares about children, but the evidence is clear that he cares a good deal more about himself and his image, and that his good intentions are regularly overwhelmed by his foul temper and massive ego.

That much was clear from the case compiled by the disciplinary board's counsel, Jonathan E. Coughlan, who earlier recommended that Ferreri be suspended for 18 months. Coughlan convincingly argued that the judge had disgraced himself and the bench in several ways, mainly by lying to reporters about other judges and court officials. He also has argued, in a separate case filed last month, that Ferreri tried to intimidate others into withdrawing challenges to his rulings; this was a polite way of saying that Ferreri is a bully.

In our view, Ferreri's conduct has been so outrageous that even Coughlan's recommended punishment may have been too lenient. It would be a great shame if the judge were to get off with the wrist-slap proposed by the disciplinary board. Only the Supreme Court, which has final say in the matter, is left to demonstrate that the dignity and respectability of the Ohio bench are more important than the tender feelings of one badly misguided, badly behaving judge.

EXHIBIT

F

653

EXHIBIT

G