[Cite as *Murray v. Chagrin Valley Publishing Co.*, 2014-Ohio-5442.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 101394**

---

**ROBERT E. MURRAY, ET AL.**

PLAINTIFFS-APPELLANTS

vs.

**CHAGRIN VALLEY PUBLISHING
COMPANY, ET AL.**

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-811106

**BEFORE:** Celebrezze, P.J., S. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** December 11, 2014

**ATTORNEYS FOR APPELLANTS**

Mark Stemm
L. Bradfield Hughes
Porter, Wright, Morris & Arthur, L.L.P.
41 South High Street
Suite 3200
Columbus, Ohio   43215-6194

Tracy S. Francis
J. Philip Calabrese
Porter, Wright, Morris & Arthur, L.L.P.
925 Euclid Avenue
Suite 1700
Cleveland, Ohio   44115

Kevin Anderson
Fabian & Clendenin, P.C.
215 South State Street
Suite 1200
Salt Lake City, Utah 84111-2323

Gary Broadbent
Michael McKown
46226 National Road
St. Clairsville, Ohio   43950

**ATTORNEYS FOR APPELLEES**

**For Chagrin Valley Publishing Co.**

J. Michael Murray
Lorraine R. Baumgardner
Berkman, Gordon Murray & Devan
55 Public Square
2200 The Illuminating Building
Cleveland, Ohio   44113

**For Patriots for Change**

Molly Gwin
Samuel M. Pipino
Isaac, Wiles, Burkholder & Teetor, L.L.C.
2 Miranova Place, Suite 700
Columbus, Ohio 43215

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} Appellants, Robert E. Murray, Murray Energy Corp. ("Murray Energy"), American Energy Corp., and the Ohio Valley Coal Co., appeal from the grant of summary judgment in favor of appellees, Patriots for Change,[1] Chagrin Valley Publishing Co., H. Kenneth Douthit III, Todd Nighswonger, David C. Lange, Douthit Communications, Inc., Sali A. McSherry, and Ron Hill (referred collectively, excluding Patriots for Change, as the "Chagrin Valley Defendants") disposing of appellants' defamation and false light claims. Appellants argue the trial court erred in granting summary judgment because there are material questions of fact regarding whether the statements made in print and online publications are actionable. After a thorough review of the record and law, we affirm the decision of the trial court.

## I. Factual and Procedural History

{¶2} On December 17, 2012, in front of the headquarters of Murray Energy in Pepper Pike, Ohio, Patriots for Change held an organized protest decrying the firing of 156 employees of various companies owned by Robert Murray the day after the presidential election. Protesters alleged that Murray fired these individuals as a political stunt. Sali A. McSherry, a reporter for the Chagrin Valley Times, interviewed protestors and sought comments from Murray and Murray Energy. She was able to contact Gary Broadbent, an employee of Murray Energy. He provided her with a statement from Murray Energy as well as statements from Robert Murray. An article appeared in the newspaper on December 20, 2012, reporting on the protest and the response from Murray and Murray Energy. On January 3, 2013, an editorial written by Editor Emeritus David

---

[1] This organization was incorporated at some point in the past, but had its articles of incorporation cancelled. It has since been reinstated, according to its answer.

Lange appeared in the Chagrin Valley Times. It was critical of Murray and other appellants. The commentary was published in conjunction with a cartoon unfavorably depicting Murray that was penned by Ron Hill.

{¶3} Appellants filed a complaint sounding in defamation and invasion of privacy (false light) in the common pleas court of Belmont County, Ohio, on January 11, 2013. An amended complaint was filed on March 21, 2013, in response to a motion for a change in venue filed by appellees. On June 17, 2013, the Belmont County court issued a lengthy and well reasoned journal entry granting appellees' motion and transferring the case to Cuyahoga County.

{¶4} The lower court received the transferred case on July 23, 2013. Appellees filed answers, and discovery was conducted. Numerous discovery disputes arose regarding depositions and document requests directed toward Murray and other plaintiffs. Eventually all depositions were completed and transcripts were filed with the court. On March 20, 2014, Patriots for Change filed its motion for summary judgment. The next day, the remaining appellees filed their own motion for summary judgment with several appendices. On March 24, 2014, Patriots for Change filed a supplemental memorandum. On April 23, 2014, appellants filed their first opposition to summary judgment, also attaching significant appendices. On April 28, 2014, appellants filed a combined brief in opposition to Patriots for Change's motion. A reply brief was filed by the Chagrin Valley Defendants on May 5, 2014. On May 9, 2014, the trial court granted appellees' motions. Appellants then timely filed the instant appeal.

## II. Law and Analysis

### A. Standard of Review

{¶5} The trial court granted summary judgment on behalf of appellees.

Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶6} It is well established that the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). In *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996), the Ohio Supreme Court modified and/or clarified the summary judgment standard as applied in *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991). Under *Dresher*, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, *and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.*" (Emphasis sic.) *Id*. at 296. The nonmoving party has a reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. *Id*. at 293. The nonmoving party must set forth "specific facts" by the means listed in Civ.R. 56(C) showing a genuine issue for trial exists. *Id*.

{¶7} This court reviews the lower court's granting of summary judgment de novo. *Brown v. Scioto Cty. Commrs.*, 87 Ohio App.3d 704, 622 N.E.2d 1153 (4th Dist.1993). Defamation and false light claims are particularly well-suited to summary judgment because "'the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice'" is a question of law. *Clark v. E! Entertainment TV, L.L.C.*, M.D.Tenn. No. 3:13-00058, 2014 U.S. Dist. LEXIS 144414, *28 (Oct.

10, 2014), quoting *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn.App.2007). *See also Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 120, 413 N.E.2d 1187 (1980).

## B. Defamation

{¶8} The First Amendment provides that "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *." This "constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). As such, the Constitutional privilege includes laws that seek to impose civil liability for speech that falls within the protections of the First Amendment. *New York Times* at 277.

{¶9} Not all speech, however, is protected, as noted by the Supreme Court:

[W]e have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." [*New York Times*] at 279-280. False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective. *See Gertz [v. Robert Welch, Inc.*, 418 U. S. 323, 340, 344, n.9 (1974)]. But even though falsehoods have little value in and of themselves, they are "nevertheless inevitable in free debate," *id*. at 340, and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted "chilling" effect on speech relating to public figures that does have constitutional value. "Freedoms of expression require 'breathing space.'" *Philadelphia Newspapers, Inc. v. Hepps*, 475 U. S. 767, 772 (1986) (quoting *New York Times*, 376 U. S. at 272). This breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove both that the statement was false and that the statement was made with the requisite level of culpability.

*Hustler Magazine v. Falwell*, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The requisite culpability is malice. Malice indicates publication of a factual assertion "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times* at 280.

> "Since reckless disregard is not measured by lack of reasonable belief or of ordinary care, even evidence of negligence in failing to investigate the facts is insufficient to establish actual malice. Rather, since 'erroneous statement is inevitable in free debate, and * * * must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive," * * *' (*New York Times*, supra, at pages 271-72), '[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"

*Scott v. News-Herald*, 25 Ohio St.3d 243, 248, 496 N.E.2d 699 (1986), quoting *Dupler*, 64 Ohio St.2d at 119, 413 N.E.2d 1187 (1980), quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

{¶10} There is no real dispute that Murray and his companies, through his actions and the events that attained national prominence, are public figures subject to comment and discussion. Therefore, we review the trial court's decision using case law dealing with comment regarding public figures.

## 1. McSherry's News Article

{¶11} The article, published on December 20, 2012, and included in its entirety in the appendix to this decision, focused on the protest that occurred on December 17, 2012, in front of the headquarters of Murray Energy. McSherry quoted protestors and included descriptions of the signs they carried. The article also included responses to the protest by a Murray Energy representative and statements by Murray supplied to McSherry by the representative. Ironically, those statements include allegations that the protesters committed crimes, lied, and that they possessed ulterior motives for their actions; the same types of statements appellants allege are defamatory.

{¶12} The news article is intended to be factual and addresses a newsworthy event. Appellants take issue with a number of statements made therein. They claim the protestors made defamatory statements that were published in the article that Murray or his related companies are known for violating environmental and safety regulations. First, this was published as an opinion of one of the protestors, not as an accurate fact about Murray's reputation. But even construing this statement as a fact, it is still not an actionable statement of fact against McSherry and the other Chagrin Valley Defendants because it was a reasonable statement based on a history of safety and environmental regulatory violations produced by appellees in the record. Appellants argue that the trial court ignored a significant body of evidence they put forth in the record through depositions of Murray Energy employees that its safety and environmental records were either no worse than other mining companies or the information relied on by appellees was outdated.

{¶13} In this context, a public figure may recover damages "for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly

unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

{¶14} The expert testimony offered by appellants notwithstanding, there is no such deviation in the present case. Appellants claim McSherry was reckless in failing to verify the statements made by Patriots for Change that were included in the article. "'[A]ny one claiming to be defamed by the communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of public concern, public men, and candidates for office.'" *New York Times*, 376 U.S. at 281-282, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), quoting *Coleman v. MacLennan*, 78 Kan. 711, 723, 98 P. 281 (1908). Based on the significant history of safety and environmental violations, there was no evidence of a failure to investigate this statement.

{¶15} Appellants offered expert testimony that concluded McSherry failed to properly investigate the story before publication. Appellants' arguments seem to be that McSherry failed to properly investigate the statements made by members of Patriots for Change even though these statements were supported by materials produced in discovery. Appellants' "suggestions on how defendants should have conducted their investigation provide[s] no foundation for a jury to conclude that defendants subjectively contemplated 'serious doubts' about the truth of the statements." *Thomas M. Cooley Law School v. Kurzon Strauss, L.L.P.*, 759 F.3d 522, 534 (6th Cir.2014), citing *Perk v. Reader's Digest Assn., Inc.*, 931 F.2d 408, 412 (6th Cir.1991) (holding that the defendants were not "liable for failing to perform the thorough professional investigation [the plaintiff] would have preferred").

{¶16} McSherry testified in her deposition that she did research in preparing the article including Google searches and reading articles in the New York Times, the Washington Post, and other publications. She also called the Salt Lake Tribune. In *Butts*, a newspaper published a story that relied on the affidavit of a witness without attempting to corroborate any of the statements made by the witness. The Supreme Court determined that such actions of the newspaper supported the jury finding of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id*. at 158. Here, the statement about safety and environmental violations was corroborated by McSherry. As the court found when analyzing a different article in *Butts*, there is not even ordinary negligence substantiated in the record before us regarding this statement, let alone malice.

{¶17} Next, appellants point to the quotation from a Patriots for Change protestor that the layoffs were an outrageous stunt. This is clearly a statement of opinion incapable of verification and the type of hyperbole traditionally recognized as free speech under the First Amendment as explained in the analysis of Hill's cartoon below.

{¶18} McSherry did not recklessly or knowingly publish a false statement of fact. Therefore, the trial court did not err in granting summary judgment in favor of McSherry.

### 2. Lange's Commentary

{¶19} Lange's commentary published in the Chagrin Valley Times states as follows:

Commentary
Local Protest Well Deserved

Kelly Allred, 58, Luis Harnandez, 23, Brandon Phillips, 24, Carlos Payan, 22, Manuel Sanchez, 41, and Don Erickson, 50, were not among the 158 employees fired by Moreland Hills resident Robert E. Murray in the wake of President Barack Obama's re-election. No, those six miners perished after being

trapped on Aug. 6, 2007, by a collapse at Mr. Murray's Crandall Canyon Mine in northwest Utah. Their deaths were followed 10 days later by those of three rescue workers, Dale Black, 49, Brandon Kimber, 29, and Gary Jensen, 53, who were attempting to reach them.

When coal miners' lives are so meaningless to those who reap millions from sending them into hazardous working situations in Utah, why would anyone expect their livelihoods to be any more meaningful in Eastern Ohio?

Members of Patriots for Change, a progressive organization based in Chagrin Falls, who picketed outside Murray Energy Corp.'s Pepper Pike headquarters a week before Christmas, sought to bring attention to that cold-hearted reality.

Mr. Murray was only following up on the threat he made during the election campaign, when he claimed that coal regulations anticipated under Mr. Obama's leadership would necessitate drastic cutbacks in the industry. Murray Energy is the largest privately owned coal company in America.

It comes as no surprise that Mr. Murray is so disdainful toward regulations. Following the Crandall Canyon calamity, the mine operator, Genwel Resources Inc., a Murray Energy subsidiary, was fined $1.64 million, the U.S. government's highest penalty, for violations that were determined to have directly contributed to those nine deaths.

In briefings during the failed rescue attempt in Utah, Mr. Murray told victims' family members, "the media is telling you lies," and, "the union is your enemy." As Patriots for Change pointed out in its recent protest, although 85 percent of his employees are not unionized, he still considers unions the enemy.

Five months before the Crandall Canyon deaths, a partial collapse that should have given ample warning of the impending tragedy was never officially reported to the Mine Safety and Health Administration, as required by law. Mr. Murray later claimed that he had no knowledge of that March 2007 prelude, but subsequent investigation showed that to be absolutely false.

Patriots for Change members want the public to know who the real liar is and who the coal miners' true enemy is. Government regulation is not the problem. The problem is a lack of full accountability for those who defy regulations.

{¶20} Appellants do a good job of unmooring comments from their context and arguing that the statements, taken in isolation, are factual and per se defamatory. For instance, citing

Ohio Supreme Court precedent, appellants claim that the statement that Murray is a "real liar" is actionable. But such statements must be read in context. *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 649 N.E.2d 182 (1995).

> When determining whether speech is protected opinion a court must consider the totality of the circumstances. Specifically, a court should consider: the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared.

*Id.* at the syllabus.

{¶21} When put into context, as is required by the *Vail* test, the statement is an opinion expressing a contrary view to that espoused by Murray. The editorial quotes statements Murray made to the national news media during a mining tragedy that "'the media is telling you lies,' and 'the union is your enemy.'" The commentary then points out that "Patriots for Change members want the public to know who the real liar is and who the coal miners' true enemy is." It is clear from the context that the statement is one of opinion expressed in opposition to Murray's charge that the news media was lying. These statements are entirely different from those in other cases that have found liability or a material question of fact.

{¶22} For instance, the Supreme Court addressed published accusations that a person committed perjury. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In that case, considering federal First Amendment rights, a newspaper article published in an Ohio paper accused a person of the crime of lying under oath. The leveling of an accusation of a criminal act was held by the court to be an actionable statement under Ohio libel laws, and it reversed the summary dismissal of the suit.

{¶23} In the present case, the statement referenced above is clearly a reaction to Murray's comment and an opinion about that statement. "[I]f it is plain that the speaker is expressing a

subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993).

> The courts of appeals that have considered defamation claims after *Milkovich* have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment. As the Fourth Circuit noted, "because the bases for the * * * conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." *Chapin* [*v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir.1993)]. Similarly, the District of Columbia Circuit has noted that "'because the readers understand that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.'" *Moldea* [*v. New York Times Co.*, 22 F.3d 310, 317 (D.C. 1994)]. Finally, the First Circuit has held that, as long as the author presents the factual basis for his statement, [it] can only be read as his "personal conclusion about the information presented, *not as a statement of fact*." *Phantom Touring, Inc.* [*v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir.1992)] (emphasis added). Thus, * * * the statements would be protected since, read in context, they are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader. Thus, we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.

*Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir.1995).

{¶24} Further, the Ohio Supreme Court's reaction to *Milkovich* was to solidify Ohio's staunch support for free speech. *See Vail*. In *Vail,* and later in *Wampler v. Higgins*, 93 Ohio St.3d 111, 752 N.E.2d 962 (2001), the Ohio high court addressed the *Milkovich* holding that no separate "opinion exception" to defamation existed or was required. The *Vail* court held that, based on the Ohio Constitution, such a separate exception existed in Ohio for news organizations and journalists and *Wampler* extended that exception to Ohio citizens generally.

{¶25} Appellants also contend that Lange insinuated that Murray was a liar when Lange alleged that Murray falsely denied knowing about a previous incident, known as a "bounce," that proceeded the collapse that killed nine miners at the Crandall Canyon Mine. Lange points to a Salt Lake Tribune article published January 17, 2008. The article documented that the newspaper obtained records of executive meetings where Murray was present that discussed this bounce. The article then stated, "Murray, who led the rescue efforts in August, said at the time he had no knowledge of the bounce." This statement was not attributed to any specific source. Appellants now claim that the denial relates to a statement Murray made during a National Public Radio ("NPR") interview in the aftermath of the tragedy that he was unaware of an engineering report, not about a previous incident. However, the article does not mention an NPR interview. The article clearly states,

> [w]hen *The Tribune* asked Murray about the March bounce a week after the August collapse, he said, "It's the first time I've heard of this." Murray blamed the collapse on an earthquake, a viewpoint discredited by scientists, and insisted there was no retreat mining in Crandall Canyon — a statement also refuted by the meeting minutes.

{¶26} This article provides a clear basis for Lange's statement. Appellants claim Lange could not rely on the article because it contained a disclaimer intended to limit the Salt Lake Tribune's liability, which provided, "This is an archived article that was published on sltrib.com in 2008, and information in the article may be outdated. It is provided only for personal research purposes and may not be reprinted." This disclaimer does not limit the factual claims in the article that Murray was interviewed by the Salt Lake Tribune and he disclaimed knowledge of a previous incident at the time, which was later contradicted by meeting minutes. Whether that it true or not is beyond the scope of this appeal. This appeal focuses on whether Lange had a basis to believe that his statements were true or whether he recklessly avoided determining the veracity

of the published statements of fact. The article relied on by Lange affirmatively demonstrates a lack of malice.

{¶27} The statement calling Murray a liar, along with statements commenting on the value Murray places on the lives and well-being of his employees, are opinions. Examining the totality of the circumstances, the statements appear as a commentary in a "letters to the editor" section of a news paper. This signals to readers that what follows is generally the opinion of the author. The language used also makes clear that the statements are regarding a debate raging between two sides. Further, these statements are not readily verifiable. This can be seen most clearly when examining the statement indicating Murray fired miners the day after the presidential election for  political retribution. As explained below in the analysis of the Hill cartoon, Murray may possess ulterior motives for terminating employees the day after the presidential election, but only Murray would truly be privy to that information.

{¶28} Appellants point to other statements that are more amenable to arguments that they are factual in nature. Lange's commentary stated that a subsidiary of Murray Energy was "fined $1.64 million, the U.S. Government's highest penalty, for violations that were determined to have directly contributed to those nine deaths." The Murray Energy subsidiary was initially fined that amount, but it was later reduced through settlement negotiations. Appellants argue this was not the largest fine ever imposed. However, Lange again supported the most substantive part of this statement with citations to governmental information releases. A 2008 United States Department of Labor's Mining Safety and Health Administration release stated the amount of the fine, and other news sources, including CNN, reported that the fine was the largest ever imposed for coal mine safety violations. This release also indicates that the safety violations contributed to the deaths of miners. Whether the fine was the largest imposed at the

time or the third largest ever imposed at the time the commentary was published is not materially different. The fact that the fine was later reduced as part of a settlement and the contributory nature of the violations were not included in the final admissions in the settlement does not change the fact that statements were made without the malice necessary for a successful claim.

{¶29} Appellants also take issue with the statement that Murray never officially reported a prior incident to governmental mining regulators in compliance with regulations. As set forth by the regulations and argued by appellees, such incidents are required to be reported within 15 minutes of occurrence. However, appellants admit that the incident was not reported to the regulatory agency until a few days later. Lange's statement that the incident was not officially reported as required by law is a substantially accurate statement.

{¶30} Based on these factors, the commentary is protected opinion designed to convey the writer's opinion on a matter of importance in the community. Appellants must show that statements made by Lange were made with actual malice, meaning with knowledge of falsity or a reckless indifference to their truth. The fact that the statements are supported leaves no material question of fact that Lange did not knowingly publish false information with actual malice. On the whole, the piece is an opinion with few factual statements, and any error therein was published without actual malice.

{¶31} The trial court did not err in granting summary judgment in favor of Lange.

### 3. Hill's Political Cartoon

{¶32} In the long history of political satire and cartoons that have been held to be acceptable expressions of ideas, the cartoon penned by Hill is rather benign. It features a snowman made of lumps of coal with a wrinkled carrot nose, holding a sack of money in each had and singing "Murray the Coal-man...meant to hoard away his pay...with the vote all in, the

layoffs begin — with the prez he'll never play!" Hill stated in his deposition that the words were meant to be sung to the tune of "Frosty the Snowman." Appellants' reaction to the cartoon, as outlined in their arguments below and in their appellate brief, bear no resemblance to the actual image published in the newspaper. At one point, Murray claims the cartoon is meant to portray him as mentally deranged.[2] The cartoon does not convey such an idea. The cartoon is clearly a protected expression of ideas in the long tradition of satirical cartoons upheld in *Falwell*, 485 U.S. at 54-55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The *Falwell* court reaffirmed that a cartoon such as the one above could only be actionable if it contained an injuriously false factual assertion made with actual malice. *Id*. at 56. The cartoon above contains no factual assertion. It is clearly hyperbole not reasonably capable of being interpreted as a factually defamatory statement. *Ferreri v. Plain Dealer Publishing Co.*, 142 Ohio App.3d 629, 756 N.E.2d 712 (8th Dist.2001). Interpreting the text and image as appellants do, the cartoon implies, as does McSherry's news article and Lange's commentary, that Murray fired individuals in response to President Obama's re-election. This is an opinion not subject to ready verification.

{¶33} The Chagrin Valley Defendants herein were not the only news organization to draw this conclusion from Murray's actions and public statements. In a suit brought by Murray against a national news organization, the Ohio federal district court judge presiding over the case granted the news organization's motion to dismiss finding that statements implying that Murray fired employees out of spite were not actionable:

> Plaintiffs argue that the article presents an actionable statement by implying that Murray fired more than 150 miners as a result of President Obama's reelection.

---

[2] This reaction is premised on the use of the word "hoard" in the poem.

This court agrees that the article draws a connection between the election result and the terminations, stating that the dismissals "may well have been the fulfillment of a promise" and that Murray "fires his workforce wholesale in fits of spite when electoral results disappoint him." The court disagrees, however, with the proposition that these statements and their apparent implication are actionable. Similar to the article in *Bentkowski* [*v. Scene Magazine*, 637 F.3d 689 (6th Circ.2011)], the article at issue here "does not expressly state or clearly imply" that the subject of the article acted with an illicit motive. [*Id.* at] 694. Rather, the article engages in conjecture that Murray may have acted out of spite, which begs the response of: so what? Regardless of whether the intended implication is that Murray is a man of his word or a spoiled individual mired in pettiness, the specific language used in making the point fails to capture an illicit motive. Pettiness is not a crime, and neither is exercising employment at will terminations for legal reasons, regardless of whether such reasons are logical, illogical, or just plain silly. Moreover, even accepting Plaintiffs' construction of the passages involved, the article vaguely alludes to improper motives of unfixed meaning so that there is no clear factual implication of a "wrongdoing" beyond what the author of the article might suggest is a moral failing. In other words, such obvious speculation as to motivation is not a factual statement.

*Murray v. Huffingtonpost.com, Inc.*, S.D. Ohio No. 2:13-cv-1066, 2014 U.S. Dist. LEXIS 64944, 14-15 (May 12, 2014). This holding of the federal district court applies equally here.

{¶34} Appellants claim that Hill did no investigation before penning the cartoon and argue this shows reckless indifference for the truth. In his deposition testimony, Hill explained that he came up with the idea for the cartoon after reading a news article that accurately quoted Murray and provided that 158 employees were fired the day after the presidential election. Hill's cartoon is a reasonable conclusion drawn from Murray's own actions and statements. One need not hold advanced degrees in mining or economics to draw the conclusions above. Murray's own statements and actions lead to this conclusion regardless of his actual motives known only to him.

{¶35} Based on the above holdings, the trial court did not err in granting summary judgment to Hill, Lange, McSherry, and the related publishing and newspaper defendants.

**4. Patriots for Change Statements**

{¶36} Patriots for Change twice emailed its members a digital newsletter and included similar statements in its online calendar advising where the protest against Murray Energy was scheduled to take place. These all included similar language. Two statements are addressed in appellants' brief. They argue that statements claiming Murray is known for violating environmental regulations and that he fired employees to make a political statement are actionable statements.

{¶37} As addressed above, whether Murray fired employees in order to make a political statement is an opinion and not a proper subject for a claim of defamation. The other statement is also addressed above. Appellants claim Patriots for Change did no investigation of whether appellants were known for violating safety and environmental regulations but wholly relied on statements made by a few members. Patriots for Change counters that it possessed significant information based on widely publicized media accounts supporting its statements. A significant history of safety and environmental violations appears in the record. As found above, no malice is present in this record. Therefore, the trial court did not err in granting summary judgment to Patriots for Change.

### C. False Light

{¶38} False-light invasion of privacy has been described:

> An actionable invasion of the right of privacy is [1] the unwarranted appropriation or exploitation of one's personality, [2] the publicizing of one's private affairs with which the public has no legitimate concern, or [3] the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

*Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956), paragraph two of the syllabus. The Ohio Supreme Court officially recognized this tort, stating:

> We therefore recognize the tort of false-light invasion of privacy and adopt Restatement of the Law 2d, Torts, Section 652E. In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Welling v. Weinfeld*, 113 Ohio St.3d 464, 473, 2007-Ohio-2451, 866 N.E.2d 1051. Here, there are no untruthful statements commenting on private matters that placed any appellant in a false light that would be highly offensive to a reasonable person. The tort "applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." *Welling* at ¶ 55.

{¶39} The comments made in this case were in regard to public actions of Murray and Murray Energy or its subsidiaries. Murray issued press releases, conducted press conferences before national news media, and publicly set forth a narrative that appellees disagreed with and commented on. Those comments were substantially true or protected opinion, and there is no showing they were made with reckless disregard as to the falsity of the statements or that they painted appellants in a false light rather than a light merely contrary to Murray's public narrative.

### III. Conclusion

**{¶40}** The articles and statements appellants attached to their complaint are protected First Amendment speech or statements published without actual malice. This case illustrates the need for Ohio to join the majority of states in this country that have enacted statutes that provide for quick relief from suits aimed at chilling protected speech. These suits, referred to as strategic lawsuits against public participation ("SLAPP"), can be devastating to individual defendants or small news organizations and act to chill criticism and debate. The fact that the Chagrin Valley Times website has been scrubbed of all mention of Murray or this protest is an example of the chilling effects this has. Many states provide that plaintiffs pay the attorney fees of successful defendants and for abbreviated disposition of cases. In this era of decentralized journalism where the internet has empowered individuals with broad reach, society must balance competing privacy interests with freedom of speech. Given Ohio's particularly strong desire to protect individual speech, as embodied in its Constitution, Ohio should adopt an anti-SLAPP statute to discourage punitive litigation designed to chill constitutionally protected speech.

**{¶41}** Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR

**APPENDIX**

News article written by Sali A. McSherry, published in the Chagrin Valley Times on December 20, 2012:

Local group protests firm's post-election layoffs

PEPPER PIKE – Demonstrators carrying signs that read "How does Murray Energy say Merry Christmas? You're fired" and "Mr. Murray stop intimidating your coal mining employees" numbered about 20 outside of Murray Energy Corp. on Monday.

Organized through Patriots for Change, headquartered in Chagrin Falls, the demonstration was directed at Moreland Hills resident  Robert E. Murray, who owns the largest privately owned coal company in America that employs about 3,000 people, 85 percent of which are not in a union, and produces about 30 million annual tons of bituminous coal, according to Gary Broadbent of Murray Energy.

Patriots for Change member Lisa Ciocia, who orchestrated the demonstration on both sides of Chagrin Boulevard near the Murray Energy headquarters, called Mr. Murray a "bully."   The day after the presidential election in which President Barack Obama was re-elected, she said, Mr. Murray fired 158 employees and blamed the president's administration for the struggling coal industry.

According to a statement Tuesday by Mr. Murray, "The protests were organized by a self-described 'militant' unionist labor group of retirees who favor forced unionism, excessive regulation, socialized medicine, increased taxes and the end of free-market capitalism."

According to Patriots for Change, Mr. Murray owns mines in Ohio, Utah and other states and is known for violating federal safety and Environmental Protection Agency regulations, but his workers have no voice because only one mine is unionized. He owns the Crandall Canyon Mine that exploded in 2007, trapping six miners and killing an additional three rescuers, a group newsletter stated.

It's outrageous that Mr. Murray, an avid financial supporter of 2012 presidential Republican candidate Mitt Romney, would pull a stunt like this, demonstrators said, in laying off workers and "invoking God's forgiveness, but

saying he had no choice because of the direction Obama is taking our country," according to the newsletter.

Mr. Murray runs his company through intimidation, Mrs. Ciocia said. "It's a troubling trend." She also referred to reports of company employees being forced to attend a rally for Mr. Romney in August. According to Mr. Murray, employees took out full page advertisements to claim that they chose to be there and knew that they would not be paid.

"One of our blanket issues is fair employment," said Becky Thomas of Chagrin Falls, who founded Patriots for Change with Judy Kramer. The way Mr. Murray treats his employees and his tactics were at the root of the demonstration.

"Mr. Murray believes that employees should have the right to determine whether they want to be represented by a union, and if so, which one," Mr. Broadbent said in a statement. "The union-sponsored protestors want to force unions on all workers. They are afraid of an Ohio Right-to-Work law, such as the one passed in Michigan in November."

The protesters trespassed on private property and held dishonest signs insulting him and the company, Mr. Murray said. He and Murray Energy are considering legal options to recover for damages and to prevent further trespassing.

In an outline of America's future to his employees, Mr. Murray said, "While putting Murray Energy into a survival mode, I will be fighting allegations from radical Obama supporters that you know are blatantly false and were inspired only to shut down our opposition to them on behalf of our employees, your area, and our country."

Jim Ciocia is outraged that the company expects undying loyalty, but doesn't feel it owes reciprocity to its employees. Workers go into coal mines and risk their lives to make a lot of money for Mr. Murray, but he shows no respect for them, he said.

In Mr. Murray's outline of America's future statement, he foresees drastically reduced electric power consumption, more drastically reduced coal markets, total destruction of the coal industry by as early as 2030 and enactment of 12 regulations pending from the EPA, among other concerns.

Some energy industry analysts have said that, due to the low cost of natural gas and rising coal production costs, the coal mining business is suffering.

In a personal prayer Mr. Murray delivered to employees the day after the presidential election, he said, "Lord, please forgive me and anyone with me in the

Murray Energy Corp. for decisions that we are now forced to make to preserve the very existence of any of the enterprises that you have helped us build."

Patriots for Change is "a progressive voice in the Chagrin Valley that advocates for economic and social injustice through education and community action," according to its mission. There are about 180 dues-paying members and 350 on the organization's mailing list.