*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

DAVID A. BENTKOWSKI,

               *Plaintiff-Appellant,*

    *v.*

SCENE MAGAZINE, aka Cleveland Scene;
CLEVELAND SCENE PUBLISHING, LLC,
CLEVELAND SCENE, LLC, VILLAGE VOICE
MEDIA HOLDINGS LLC,

               *Defendants-Appellees.*

> No. 09-4547

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-02154—Christopher A. Boyko, District Judge.

Decided and Filed: April 19, 2011

Before: MARTIN, SUHRHEINRICH, and KETHLEDGE, Circuit Judges.

————————————

## COUNSEL

**ON BRIEF:** Brent L. English, LAW OFFICES OF BRENT L. ENGLISH, Cleveland, Ohio, for Appellant. Kenneth Alan Zirm, Kate E. Ryan, ULMER & BERNE LLP, Cleveland, Ohio, for Appellees.

————————————

## OPINION

————————————

BOYCE F. MARTIN, JR., Circuit Judge. Plaintiff-Appellant David A. Bentkowski, the Mayor of Seven Hills, Ohio, sued Defendants-Appellees Scene Magazine, Cleveland Scene Publishing, LLC, Cleveland Scene, LLC, and Village Voice Media Holdings LLC for defamation arising from an article published in a weekly publication called *Cleveland Scene*. The district court granted Appellees' motion for

1

summary judgment and Bentkowski appeals. In addition, Bentkowski claims that the district court erred in denying his motion for an extension of time to complete discovery and in striking his first amended complaint as a sanction. We **AFFIRM** the district court's grant of summary judgment and its discovery and sanction orders.

## I. BACKGROUND

Bentkowski has served as the Mayor of Seven Hills since 2003. He alleges that Appellees defamed him in an article by Joe Tone published in the "First Punch" section of *Cleveland Scene* on August 1, 2007. The article, entitled "The Bizarre Boy Mayor," reads in its entirety:

> In his latest attempt to prove how super-duper cool his city is, Seven Hills Mayor David Bentkowski recently sent a bizarre letter to the suburb's "young residents." The three-page missive, mailed to residents "18-40ish," explains that "Seven Hills is actually starting to become 'hip,'" noting everything from the suburb's sweet rec center to rad schools to killer sports leagues. (The mayor even plays flag football: "It is a blast.")
>
> Apparently under the impression he's mayor of Autistic Village, Bentkowski also instructs residents exactly how to respond "if someone ever asks you about living in Seven Hills.["]
>
> "You tell them the following: Seven Hills is awesome," he implores.
>
> The letter, which reads like a student-council campaign speech, is vintage Bentkowski. This, after all, is a 34-year-old mayor who brags about his youth, proudly wears Superman tights, and routinely tries to pull off stunts like limiting residents' feedback at meetings and barring government employees from running for office. Bentkowski, it's safe to say, has the political IQ of Quiznos' lettuce.
>
> The letter also includes a lengthy questionnaire that asks residents to provide the ages and names of "everyone living in your household." This, Bentkowski writes, "will help us notify you of various things that may be of interest to you. For example, if you have an 18-year-old daughter we can invite her to participate in the Miss Seven Hills Pageant," an event the mayor has insisted he emcee. It also asks for e-mail, web, and MySpace addresses.
>
> The mayor says he's just trying to stay in touch with residents. But the letter left some members of city council scratching their heads, says

councilman Frank Petro, a regular critic of the Boy Mayor®. Nowhere does the questionnaire say it's voluntary or that personal information will be kept private. The letter doesn't appear on city letterhead and includes the mayor's personal web address. But it was paid for by the city.

"Council never approved it," Petro says. "I don't understand who 'we' is. He refers to 'we' this and 'we' that. Who's 'we?'"

Finally, the letter includes a "special invite" to a concert by the Spazmatics, an '80s cover band. Though the concert was part of last weekend's Seven Hills Home Days festival, the invite dubbed it a "Special Home Days Concert for 'Younger' Residents."

Petro, 51 years old, wasn't sure he qualified.

"I don't know," he said last week. "I hope I'm allowed to go."

Bentkowski claims that two main portions of the article are defamatory: (1) the allegation that he "routinely tries to pull off stunts like limiting residents' feedback at meetings and barring government employees from running for office"; and (2) the portion of the article related to the "young residents" letter, which Bentkowski alleges falsely implies that he sought personal information about his constituents, including young women, for illicit purposes.

Bentkowski filed a complaint on August 1, 2008 in the Court of Common Pleas of Cuyahoga County, Ohio. Appellees removed the case to the United States District Court for the Northern District of Ohio. On October 16, the district court held a Case Management Conference. The district court ordered that any amended pleadings be filed by December 15, 2008, and that non-expert discovery be completed by February 27, 2009. On December 14, 2008, Bentkowski filed a first amended complaint adding several new defamation claims and defendants. On February 27, 2009, Bentkowski filed a motion for an extension of time to complete non-expert discovery. On March 2, the district court denied the motion.

On March 11, the district court ordered Bentkowski to show cause as to why it should not impose sanctions for his failure to prosecute the case. The district court noted that he had failed to comply with a Settlement Conference Order and failed to conduct any discovery in the four and a half months since the Case Management Conference.

For the first time, Bentkowski's counsel informed the court that he had been incapacitated due to a serious health problem.  Bentkowski filed his response and a motion for reconsideration of the earlier denial of his motion to extend time for discovery.  On March 23, the district court denied the motion for reconsideration and struck Bentkowski's first amended complaint as a sanction for failing to prosecute the action, knowingly making false representations in his motion for an extension, and failing to comply with the Settlement Conference Order and Federal Rules of Civil Procedure.

On April 23, Appellees filed a motion for summary judgment.  On November 6, the district court granted the motion on two alternative grounds: (1) the article was opinion and thus absolutely privileged under the Ohio Constitution; and (2) Bentkowski failed to establish that Appellees had published the article with actual malice, as required in public official defamation cases.  On December 7, Bentkowski filed a notice of appeal, stating that he was appealing from the district court's order granting Appellees summary judgment and its judgment order terminating the action.

## II. ANALYSIS

### A. Motion for Summary Judgment

We review the district court's grant of summary judgment de novo.  *Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A district court should enter summary judgment in a defendant's favor in a defamation action if it appears that the plaintiff cannot establish any one of the elements of the claim.  *Celebrezze v. Dayton Newspapers, Inc.*, 535 N.E.2d 755, 759 (Ohio Ct. App. 1988).  The elements of a libel claim under Ohio law are: (1) "the assertion of a false statement of fact;" (2) "the false statement was defamatory;" (3) "the false defamatory statement was published by defendants;" (4) "the publication was the

proximate cause of the injury to the plaintiff;" and (5) "the defendants acted with the requisite degree of fault." *Id.*

The United States Supreme Court does not recognize "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). However, "[t]he Ohio Constitution provides a separate and independent guarantee of protection for opinion ancillary to freedom of the press." *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 185 (Ohio 1995). To determine whether a statement constitutes protected opinion or actionable fact, courts consider the totality of the circumstances, including factors such as: (1) "the specific language used"; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and (4) "the broader context in which the statement appeared." *Id.* Weighing these factors, we agree with the district court that there is no genuine issue of material fact, and the article is protected opinion as a matter of law.

**1. Specific language**

Under the first factor, we review the specific language of the statements at issue. "We seek in this branch of our analysis to determine whether the allegedly defamatory statement has a precise meaning and thus is likely to give rise to clear factual implications." *Wampler v. Higgins*, 752 N.E.2d 962, 978 (Ohio 2001). Typical examples of actionable language include accusations of punishable criminal or disciplinary conduct. *Vail*, 649 N.E.2d at 186.

The specific language of the portion of the article related to the "young residents" letter does not support actionability. Bentkowski claims that the article's juxtaposition of a description of the "young residents" letter with the statement that he insisted that he emcee a pageant implies that he had improper motives in sending the letter. However, the article does not expressly state or clearly imply that Bentkowski had an illicit motive in sending the letter. *Cf. Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio 1986) (specific language weighed in favor of actionability when "the clear impact in some nine sentences and a caption" was that appellant committed perjury). Furthermore, even if we were to draw the implication that Bentkowski urges us to, the language of this

portion of the article perhaps vaguely alluding to improper motives lacks a precise meaning that would give rise to clear factual implications. *See Vail*, 649 N.E.2d at 186 (statements that appellant engaged in "an anti-homosexual diatribe" and fostered "homophobia" lacked precise meaning that would support actionability).

The specific language that Bentkowski "routinely tries to pull off stunts like limiting residents' feedback at meetings and barring government employees from running for office" weighs in favor of actionability. The average reader could construe these statements as communicating objective facts rather than subjective opinions. *Cf. id.* (veiled characterization of appellant as a liar could be construed as an objective statement). These statements are sufficiently precise as the language is commonly understood to constitute factual statements, which favors actionability.

**2. Verifiability**

Under the second factor, we must determine whether the statements are verifiable. The Ohio Supreme Court has stated that if a "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Scott*, 496 N.E.2d at 707 (internal quotation marks and citation omitted). Whether Bentkowski had improper motives in sending the "young residents" letter is not verifiable because there are no objective tests to determine his internal motivation in sending the letter. *Cf. Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712, 721 (Ohio Ct. App. 2001) (noting that statement that an individual cares more about himself and his image than children is not actionable in part because there are no objective tests to verify it). Thus, this factor weighs against actionability.

The references to Bentkowski limiting feedback at meetings and barring government employees from running for office are possibly verifiable facts. *Cf. Scott*, 496 N.E.2d at 707 (recognizing that whether an individual perjured himself "is certainly verifiable by a perjury action with evidence adduced from the transcripts and witnesses present at the hearing"). Thus, this factor weighs in favor of actionability.

Therefore, under the first two factors, the portion of the article related to the "young residents" letter does not support a cause of action.  However, the statements about Bentkowski limiting feedback at meetings and barring government employees from running for office might support a cause of action.  This does not end our inquiry.  The Court of Appeals of Ohio has recognized that the "language of the entire column may signal that a specific statement which, sitting alone, would appear to be factual is in actuality a statement of opinion." *DeVito v. Gollinger*, 726 N.E.2d 1048, 1051 (Ohio Ct. App. 1999) (internal quotation marks and citation omitted).  As discussed below, we find that the remaining factors in the analysis transform these statements into inactionable opinion.  *Cf. id.*

**3. General and broader context**

Ohio case law displays some confusion as to what constitutes "general context" as opposed to "broader context."  *Compare Vail*, 649 N.E.2d at 185, *with Wampler*, 752 N.E.2d at 980.  We evaluate both factors together for ease of discussion, and use general context to refer to the entire work at issue, and broader context to refer to the publication in which the work appears.

First, we examine the general context of the article as a whole to determine "the larger objective and subjective context of the statement[s]." *Scott*, 496 N.E.2d at 707.  "We examine more than simply the alleged defamatory statements in isolation, because the language surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer." *Wampler*, 752 N.E.2d at 980.  We consider whether the statements at issue are objective facts or subjective hyperbole.  *Vail*, 649 N.E.2d at 186.  Here, the statements at issue were clearly made in the general context of opinion.  The article uses words and phrases such as "super-duper cool," "sweet," "rad," "killer," "Autistic Village," "student-council campaign speech," and "political IQ of Quiznos' lettuce."  It uses simile, hyperbole, and other figurative language to express ideas, and it is ridden with humor and sarcasm.  *Cf. id.* ("The general tenor of the column is sarcastic, more typical of persuasive speech than factual reporting.").  The author makes no attempt to hide his bias, and it would be

unreasonable for a reader to view his comments as impartial reporting. *Cf. Scott*, 496 N.E.2d at 708. The author's statements are "pointed, biting, and tough," and "it is apparent that the writer's intent is to persuade readers to his point of view." *Condit v. Clermont Cnty. Review*, 675 N.E.2d 475, 479 (Ohio Ct. App. 1996). Thus, this factor weighs strongly against actionability.

Turning to the broader context in which the statement appears, the Ohio Supreme Court has recognized that "[d]ifferent types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Scott*, 496 N.E.2d at 708 (internal quotation marks and citation omitted) (alteration in original). Thus, "we must examine the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion." *Id.* The column appears in "First Punch," a section of *Cleveland Scene* that features humor, comments, and criticism. Thus, this factor weighs heavily against actionability. *Cf. Vail*, 649 N.E.2d at 185 (finding that the context in which statements were made was opinion when column appeared in Forum page of newspaper and was titled "Commentary"); *Scott*, 496 N.E.2d at 708 (noting that column "appeared on the sports page—a traditional haven for cajoling, invective, and hyperbole").

Based upon the totality of the circumstances, we are convinced that there is no genuine issue of material fact as to whether the statements at issue constitute fact or opinion: the ordinary reader would accept the article as opinion. This is consistent with Ohio case law. *See, e.g.*, *Scott*, 496 N.E.2d at 709 (allegation of perjury not actionable when specific language and verifiability weighed for actionability but general and broader context weighed against); *Grabow v. King Media Enters., Inc.*, 2004-Ohio-1122, 806 N.E.2d 591, ¶ 41 (Ohio Ct. App. 2004) (statement that former mayor was a convicted felon not actionable when language and verifiability weighed in favor of actionability but general and broader context weighed against); *Jorg v. Cincinnati Black United Front*, 2003-Ohio-3668, 792 N.E.2d 781, ¶ 24 (Ohio Ct. App. 2003) (accusation of murder not actionable when specific language and verifiability weighed for

actionability but general and broader context weighed against). Therefore, the statements are protected under the Ohio Constitution, and our inquiry is at an end. We have no occasion to reach the district court's alternative holding that Bentkowski failed to demonstrate actual malice, or Appellees' argument that Bentkowski failed to produce evidence of damages linked to the article.

**B. Discovery and Sanction Orders**

Bentkowski claims that the district court abused its discretion by denying his motion for an extension of time to conduct discovery and by striking his first amended complaint as a sanction. Appellees claim that we lack jurisdiction over these appeals because Bentkowski failed to designate any discovery or sanction orders in his notice of appeal. Federal Rule of Appellate Procedure 3(c)(1)(B) provides that "[t]he notice of appeal must . . . designate the judgment, order, or part thereof being appealed." Bentkowski's notice of appeal states that he appeals from "the Court's final judgment . . . making the Opinion and Order granting Defendants' Joint Motion for Summary Judgment . . . final and appealable." We have held that an appeal from a final judgment encompasses all prior rulings and orders where the appellant does not "designate specific determinations in its notice of appeal." *Crawford v. Roane*, 53 F.3d 750, 752 (6th Cir. 1995). Thus, we have jurisdiction to review the district court's rulings on the discovery and sanction orders. We review limits on discovery and discovery sanctions for abuse of discretion. *B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 268 (6th Cir. 2008); *Phillips v. Cohen*, 400 F.3d 388, 396 (6th Cir. 2005).

**1. Discovery order**

We find no abuse of discretion in the district court's decision to deny Bentkowski's motion for an extension of time. Federal Rule of Civil Procedure 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." In reviewing a district court's denial of additional time for discovery, courts consider five factors: "(1) when the moving party learned of the issue that is the subject of discovery; (2) how the discovery would affect the ruling below; (3) the length of the

discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to . . . discovery requests." *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010). "The overarching inquiry in these overlapping factors is whether the moving party was diligent in pursuing discovery." *Id.* Here, Bentkowski filed his motion for an extension at 7:11 p.m. on the date of the non-expert discovery deadline. He made no effort to conduct discovery in the four and a half months allotted for non-expert discovery and offered no explanation for his lack of diligence. In addition, further discovery would not have affected the summary judgment ruling, and Appellees were responsive to discovery requests. Thus, it was within the district court's discretion to decline to grant Bentkowski additional time for discovery. *See, e.g.*, *Wayne v. Vill. of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994) (holding that district court's denial of defendants' motions to conduct additional discovery after the cut-off date was not an abuse of discretion when they failed to proceed with discovery during the assigned discovery period).

**2. Sanction order**

We also find no abuse of discretion in the district court's decision to strike Bentkowski's first amended complaint as a sanction. The district court found that Bentkowski engaged in six types of sanctionable conduct: (1) failing to provide initial disclosures; (2) failing to prosecute the action; (3) failing to comply with the Settlement Conference Order; (4) failing to inform opposing counsel or the court of his counsel's alleged injury; (5) failing to attempt service for almost three months; and (6) making knowingly false statements to the court in his motion to extend the non-expert discovery cut-off date. Rule 37(b)(2) permits a court to strike pleadings where a party fails to obey discovery orders. Rule 41(b) permits a court to dismiss an action with prejudice if the plaintiff fails to prosecute or to comply with a court order. The criteria for sanctions under either of these two rules are the same. *Lucien v. Breweur*, 9 F.3d 26, 29 (7th Cir. 1993). A court also has an "inherent power" to "levy sanctions in response to abusive litigation practices." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980).

We have held that in reviewing the imposition of sanctions for an abuse of discretion, an appellate court should consider: "(1) whether the adversary was prejudiced by the dismissed party's failure to cooperate in discovery, (2) whether the dismissed party was warned that failure to cooperate could lead to dismissal, and (3) whether less drastic sanctions were imposed or considered before dismissal was ordered." *Taylor v. Medtronics, Inc.*, 861 F.2d 980, 986 (6th Cir. 1988). Here, the district court found that there would be prejudice to Appellees because Bentkowski had not yet perfected service on newly named defendants, and the need of those new defendants to conduct their own discovery would delay the case. The district court clearly placed Bentkowski on notice of the possibility of sanctions because the Case Management Order stated that "[t]his Order shall constitute notice for purposes of sanctions up to and including dismissal and/or striking of offending party's pleadings for failure to abide by any Court Order." The district court did not specifically state whether it considered less drastic sanctions. However, it found that Bentkowski knowingly made false representations in his motion for extension of time. *Cf. Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985) ("Dismissal of an action for failure to cooperate in discovery is a sanction of last resort that may be imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault."). Thus, we cannot say that the district court abused its discretion in crafting a sanction when Bentkowski failed to prosecute the action, knowingly made false representations to the court, and failed to comply with the court's Settlement Conference Order and Federal Rules of Civil Procedure.

### III. CONCLUSION

Because the article at issue constitutes protected opinion under the Ohio Constitution, we **AFFIRM** the district court's grant of summary judgment. Because we cannot say that the district court abused its discretion in denying Bentkowski's motion for an extension of time or in striking his first amended complaint as a sanction, we **AFFIRM** the district court's discovery and sanction orders.